# In the United States Court of Federal Claims

No.  10-733C

(Filed: January 30, 2014)

| | |
|---|---|
| **********************************<br><br>**AEY, Inc.,**<br><br>     **Plaintiff,**<br><br> **v.**<br><br>**UNITED STATES,**<br><br>     **Defendant.**<br><br>********************************** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Contract case; counterclaims for forfeiture based on fraud and for penalties and damages premised on the False Claims Act; motion to amend reply to counterclaims; scope of Forfeiture Statute, 28 U.S.C. § 2514; material facts in dispute regarding waiver of Forfeiture Statute |

Cyrus E. Phillips, IV, Albo & Oblon, L.L.P., Arlington, Virginia, for plaintiff.

Anna Bondurant Eley, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her on the briefs were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Kirk T. Manhardt, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice, Washington, D.C.  Of counsel was J. Mackey Ives, Litigation Attorney, General Litigation Branch, Army Litigation Center, Fort Belvoir, Virginia.

**OPINION AND ORDER**

LETTOW, Judge.

In this contract case, AEY, Inc. ("AEY") contends that the United States Army ("the Army") wrongfully withheld payment on two invoices submitted by AEY for ammunition delivered to the Army for use by Afghan troops and police.  The government counterclaims that AEY is liable for forfeiture of its claims because the two invoices at issue pertain to a contract tainted by fraud in an unrelated, earlier aspect of contractual performance and that AEY additionally is liable for damages under the False Claims Act, 31 U.S.C. § 3729, for prior false invoices submitted pursuant to the contract.  Pending before the court are the parties' cross-motions for summary judgment on the forfeiture counterclaim, plaintiff's motion to dismiss the government's count of the counterclaim based upon the False Claims Act, and plaintiff's motion to amend its reply to the counterclaims.

# BACKGROUND[1]

On January 26, 2007, the Army awarded AEY Contract Number W52P1J-07-D-0004, a firm, fixed-price requirements contract to provide non-standard ammunition for use by the Afghan National Army and Afghan National Police. Compl. ¶ 5, ECF No.1. Pursuant to this contract, the Army reportedly issued AEY as many as five delivery orders, and AEY made deliveries between May 18, 2007 and March 25, 2008. Compl. ¶ 7.[2] The parties' submissions concern only Delivery Orders 2, 3, and 4. *See* Hr'g Tr. 24:8-15.[3] Delivery Order 2 was issued on March 13, 2007, Pl.'s Mot. for Summ. Judgment Ex. 2, at 2, ECF No. 16-2, and about 35 deliveries pursuant to Delivery Order 2 took place between June 21 and November 30, 2007, Pl.'s Mot. for Summ. Judgment at 3. Delivery Order 3 was issued on June 21, 2007, *id.* Ex. 3, at 2, ECF No. 16-3, and Delivery Order 4 was issued on August 6, 2007, *id.* Ex. 4, at 2, ECF No. 16-4; Hr'g Tr. 25:22 to 26:2. The two unpaid invoices at issue in this case are for two shipments under Delivery Orders 3 and 4, *i.e.*, Shipment Nos. AEY0007 and AEY0017, respectively, which shipped on March 25, 2008 and were accepted by the government on or about March 28, 2008. Hr'g Tr. 26:3-11; Compl. ¶¶ 9, 15; *see also* Compl. Exs. 1, 5.

"The contract expressly incorporated . . . 48 C.F.R. § 252.225-7007, a provision of the Defense Federal Acquisition Regulation Supplement [("DFARS")], which provides that supplies delivered under the contract 'may not be acquired, directly or indirectly, from a [c]ommunist Chinese military company.'" *AEY, Inc. v. United States*, 99 Fed. Cl. 300, 302 (2011) ("*AEY I*") (quoting DFARS § 252.225-7007(b)). The parties agree that AEY fulfilled Delivery Order 2 by purchasing ammunition from Albania's Military Export and Import Company ("the Albanian MEICO") and that this ammunition was originally manufactured by communist Chinese military companies in factories in the People's Republic of China ("China"). Pl.'s Am. Countercl. Reply ¶¶ 39-40, ECF No. 44-1; *see also AEY I*, 99 Fed. Cl. at 302. AEY discovered the Chinese origin of the ammunition while preparing the shipment for transport from Albania to Afghanistan. An employee of AEY had gone to Albania to remove the ammunition from its wooden packing crates to save shipping costs, and he discovered Chinese characters on the crates. Pl.'s Am.

---

[1]The recitation of facts that follow is provided solely for purposes of providing a background for analysis of the motions and does not constitute findings of fact by the court. Unless otherwise noted, however, the facts set out appear to be undisputed.

[2]In its most recent filings with the court, AEY has altered its terminology and appears to be referring to Delivery Order 2 as the "first" of three delivery orders, and to Delivery Orders 3 and 4 as the "second" and "third," respectively. *See* Pl.'s Second Responsive Supplemental Br. at 2, ECF No. 67; Pl.'s Responsive Supplemental Br. at 3, ECF No. 61-1. The parties do not explain or describe Delivery Orders 1 and 5, if, indeed, any such Delivery Orders actually existed. Notwithstanding the resulting gap in the record, the court will maintain the original terminology used by the parties throughout all prior briefing, in part because the government has not altered its use of the terms, and in part because the exhibits that accompany AEY's Complaint and Motion for Summary Judgment refer to the invoices at issue as arising out of Delivery Orders (labeled as Task Orders) 3 and 4.

[3]Citations to the transcript refer to a hearing held on October 15, 2012.

Countercl. Reply ¶¶ 42-49; *see also* Def.'s Answer & Countercl. ¶¶ 42-49, ECF No. 14. According to a factual proffer later signed by AEY in connection with a criminal prosecution regarding these shipments under Delivery Order 2, AEY understood that providing ammunition manufactured in China would violate the contract's provisions, *see* Def.'s Cross-Mot. for Summ. Judgment at 3 & Ex. 1, ¶ 7 ("Factual Proffer"), ECF Nos. 22 & 22-01; *see also United States v. AEY, Inc.,* No. 08-20574-CR (S.D. Fla. Aug. 28, 2009),[4] so AEY employees discussed with one another how to conceal the ammunition's origins, Factual Proffer ¶ 9.  They decided to remove the ammunition from the wooden crates and the metal tins that had the Chinese markings, dispose of papers inside the tins containing Chinese markings, and repack the ammunition in cardboard boxes.  Factual Proffer ¶ 10.  Ultimately, AEY fulfilled Delivery Order 2 by shipping the ammunition purchased from the Albanian MEICO that was originally manufactured in China.  *See* Pl.'s Am. Countercl. Reply ¶¶ 40, 64.  AEY provided Certificates of Conformance for each shipment under Delivery Order 2, certifying that the ammunition "conform[ed] in all respects with the contract requirements."  *Id.* at ¶¶ 67, 68.

Shortly after shipments commenced under Delivery Order 2 in June 2007, the government began to suspect that the ammunition being delivered by AEY was manufactured by communist Chinese military companies, in violation of the contract.  The government executed a search warrant on AEY's place of business in Miami Beach, Florida on August 23, 2007.  Hr'g Tr. 27:1-6.  This timing is significant; the search warrant was executed shortly after Delivery Orders 3 and 4 had been issued to AEY in June and early August, and seven months before Shipment Nos. AEY0007 and AEY0017, were shipped and accepted pursuant to Delivery Orders 3 and 4, respectively.  On March 25, 2008, the day Shipment Nos. AEY0007 and AEY0017 were shipped, the Army temporarily suspended AEY from future contracting with the government. Pl.'s Am. Countercl. Reply ¶ 74; Def.'s Answer & Countercl. ¶ 74.[5]  The Army accepted Shipment Nos. AEY0007 and AEY0017 on or about March 28, 2008.  Compl. ¶¶ 9, 15.

Shipment No. AEY0007, delivered pursuant to Delivery Order 3, contained 1,797,400 rounds of 7.62x54 mm ball ammunition.  Compl. Ex. 5.  AEY states, and the government does not refute, that the ammunition was manufactured in Hungary.  Pl.'s Mot. for Summ. Judgment

---

[4]AEY is seeking reconsideration of its sentence resulting from its guilty plea in the criminal case and is challenging, among other things, the validity of the factual proffer.  *See* Motion (Complaint) to Vacate Sentence (2255), *Diveroli, et al. v. United States*, No. 12-20216 (S.D. Fla. Jan. 19, 2012), ECF No. 1.  The district court has not yet decided the pending contest of the sentence.

[5]In its Cross-Motion for Summary Judgment, the government asserts that the Army suspended further deliveries under the contract on March 28, 2008.  Def.'s Resp. to Pl.'s Mot. For Summ. Judgment & Cross-Mot. for Summ. Judgment at 2, ECF No. 22.  The government's previously filed Answer and Counterclaim, however, states that the Army temporarily suspended AEY "from future contracting with the United States [g]overnment" on March 25, 2008.  Def.'s Answer & Countercl. ¶ 74.  An e-mail written by Melanie Johnson, Chief, Propellants, Explosives, Artillery & Ammo Demil Branch, HQ, Army Sustainment Command, attached as Exhibit 9 to AEY's Motion for Summary Judgment, indicates that a suspension notice was issued on March 25, 2008.  Pl.'s Mot. for Summ. Judgment Ex. 9, ECF No. 16-9.

at 2.  The corresponding invoice number for Shipment No. AEY0007 is GOV01C07.  Compl. Ex. 5.  The Certificate of Conformance provided by AEY for this shipment was not countersigned by a U.S. Government Receiving Official.  *Id.*  A contemporaneous e-mail among government employees acknowledges that the receiving official, Lt. Col. Douglas M. Heath, United States Air Force, was waiting for approval to sign the Certificate of Conformance. Compl. Ex. 6.  Lt. Col. Heath reportedly wrote in an e-mail that the "[a]mmo arrived in correct quantity and in good shape per our ammo experts.  So shipment arrived good to go."  Compl. Ex. 6, at 2.  AEY submitted a proper invoice on or around March 31, 2008 for payment in the amount of $250,377.82, but the Army has not paid it.  Compl. ¶ 16.

Shipment No. AEY0017, delivered pursuant to Delivery Order 4, contained 1,858,560 rounds of 7.62x54 mm ball ammunition.  Compl. ¶ 9; *see also* Compl. Ex. 1.  AEY states, and the government does not refute, that the ammunition was manufactured in Bulgaria.  Pl.'s Mot. for Summ. Judgment at 2.  Lt. Col. Heath countersigned the Certificate of Conformance for this shipment, acknowledging receipt of the items and assuming responsibility for them.  Compl., Ex. 1, at 2.  The receiving report for the shipment lists the accompanying invoice number, GOV01D17, and a total price for the ammunition, $258,889.23.  *Id.* Ex. 2, at 12.  AEY properly submitted the invoice on or around March 31, 2008, in the amount of $258,889.23, but the Army has not paid it.  Compl. ¶ 10.

On May 23, 2008, the Army terminated the contract for default due to the delivery of ammunition under Delivery Order 2 that had been manufactured by a communist Chinese military company, in violation of DFARS § 252.224-7007(b).  *See AEY I*, 99 Fed. Cl. at 302; Pl.'s Am. Countercl. Reply ¶ 75.  On June 19, 2008, AEY and its officers were indicted in the United States District Court for the Southern District of Florida for crimes associated with the delivery of the Chinese-manufactured ammunition under Delivery Order 2.  *United States v. AEY, Inc., et al.*, No. 08-20574 (S.D. Fla. June 19, 2008), ECF No. 1.[6]  On May 22, 2009, prior to resolution of the criminal case in the Southern District of Florida, AEY filed a civil complaint in this court challenging the Army's decision to terminate its contract for default.  *AEY I*, 99 Fed. Cl. at 303.

Three months later, on August 28, 2009, AEY pled guilty in the district court to conspiracy to make false statements (18 U.S.C. § 1001(a)(2)), conspiracy to commit major fraud against the United States (18 U.S.C. § 1031), and conspiracy to commit wire fraud (18 U.S.C. § 1343), all in violation of the federal conspiracy statute (18 U.S.C. § 371).  *AEY I*, 99 Fed. Cl. at 303.  On September 4, 2009, this court stayed the proceedings in *AEY I* to allow the case in the district court to come to conclusion with the sentencing of AEY.  *Id.*

In the midst of the stay in *AEY I* and sentencing in the criminal case in the district court, AEY filed the present case in this court on October 28, 2010.

---

[6]A superseding indictment was filed July 17, 2008.  *See* Notice of Filing Ex. 1, Superseding Indictment, *AEY v. United States*, No. 09-330 (Fed. Cl. May 3, 2011), ECF No. 24.

On January 18, 2011, after the conclusion of sentencing in the criminal case, this court lifted the stay in *AEY I*. *See AEY I*, 99 Fed. Cl. at 303. Subsequently, on May 24, 2011, this court held that the Army properly terminated AEY's contract for default. *Id*. at 310.

As part of the plea agreement in the criminal case, AEY's president, Efraim Diveroli, had signed a factual proffer on behalf of AEY admitting to its wrongdoing. Pl.'s Am. Countercl. Reply ¶¶ 78-83; *see also* Def.'s Answer & Countercl. ¶¶ 78-83. AEY has since filed a motion in the district court to vacate its sentence and now disputes the validity of the factual proffer. *See* Motion (Complaint) to Vacate Sentence (2255), *Diveroli et al., v. United States*, No. 12-20216 (S.D. Fla. Jan. 19, 2012); *see also* Pl.'s Am. Countercl. Reply ¶ 78.

The present case contests a contracting officer's final decision. By a letter dated January 1, 2010, AEY informed the Army that Invoice No. GOV01C7 (Shipment No. AEY0007, Delivery Order 3) was in dispute, and it submitted a certified claim for the total amount of the invoice, plus applicable interest under the Prompt Payment Act and the Contract Disputes Act ("CDA"). Compl. ¶ 17 & Ex. 7. AEY submitted a similar letter and claim respecting Invoice No. GOV01D17 (Shipment No. AEY0017, Delivery Order 4), also dated January 1, 2010. Compl. Ex. 3. In a letter dated May 7, 2010, the Army's contracting officer, Kim Jones, made a final decision denying AEY's certified claims. Compl. Ex. 4.[7] In rejecting AEY's claims for Invoice Nos. GOV01C07 and GOV01D17, the contracting officer cited 28 U.S.C. § 2514 ("Forfeiture Statute" or "Special Plea in Fraud") as the reason for non-payment of the invoices. She wrote,

> Once a contract is tainted by fraud, a contractor may not recover for *any* claims arising under the contract even when the particular claim is not directly related to the fraud. *Little v. United States,* 138 Ct. Cl. 773, 778, 152 F. Supp. 84, 87 (1957). There is no need for a nexus between the fraud and the claims asserted.

Compl. Ex. 4 (citations and emphasis in original). The contracting officer also noted that "the subject contract was terminated for default" and "the [g]overnment may acquire similar supplies and the [c]ontractor will be liable to the [g]overnment for any excess costs for those supplies." Compl. Ex 4, at 2. The government has not made a claim for reprocurement costs presumably because there was no reprocurement; the government had accepted proper delivery of the acceptable ammunition in Kabul, Afghanistan.

The motions presently before this court raise primarily questions of law and can be decided without awaiting a decision from the district court regarding AEY's challenge to its sentence. The motions have been thoroughly briefed and a hearing was held on October 15, 2012. Two extended rounds of supplemental briefing occurred subsequent to the hearing, to address related arguments being made in appeals pending before the Court of Appeals for the

---

[7]According to the contracting officer's letter, AEY had submitted two other certified claims to the contracting officer for Invoice Nos. GOV01A03 and GOV01B63. The contracting officer denied those claims because the deliveries "were the subject of a Report of Discrepancy for Nonconformance that remained uncorrected when the subject contract was Terminated for Default." Compl. Ex. 4. AEY has not contested those denials.

Federal Circuit, as well as decisions rendered by the Circuit.  The motions are now ready for disposition.

## JURISDICTION

This court has jurisdiction over AEY's claims pursuant to the CDA, 41 U.S.C. § 7104(b)(1), and the Tucker Act, 28 U.S.C. § 1491(a)(2).  The CDA allows a contractor to challenge a decision of a contracting officer in denying a claim by bringing an "action directly on the claim in the United States Court of Federal Claims." 41 U.S.C. § 7104(b)(1).  The Tucker Act recognizes this grant of jurisdiction and states, "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41." 28 U.S.C. § 1491(a)(2).

The government's counterclaims are properly brought before this court pursuant to 28 U.S.C. §§ 1503, 2508.[8]

## ANALYSIS

Pending before the court are four motions: (1) AEY's motion to file an amended reply to the government's counterclaims, (2) and (3) the parties' cross-motions for summary judgment on Count I of the government's counterclaim relating to the Forfeiture Statute, and (4) AEY's motion to dismiss Count II of the government's counterclaim relating to the False Claims Act.

### I. AEY's Motion to File an Amended Reply to the Government's Counterclaims

On June 6, 2011, AEY filed its initial reply to the government's counterclaims.  *See* Pl.'s Reply to Countercl., ECF No. 15.  Fourteen months later, on October 8, 2012, AEY filed a motion for leave to file an amended reply to the government's counterclaims.  Pl.'s Mot. for Leave to File Am. Countercl. Reply, ECF No. 44.  The government opposes AEY's motion.  *See* Def.'s Resp. to Pl.'s Mot. for Leave to File Am. Countercl. Reply, ECF. No. 46.  AEY replied on October 11, 2012.  *See* Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Leave to File Am. Countercl. Reply, ECF No. 47.

AEY is seeking leave to amend its counterclaim reply because of its pending action in the Southern District of Florida to vacate, set-aside, and correct its judgment of conviction and sentence in the related criminal case.  *See* Pl.'s Mot. to File Am. Countercl. Reply ¶¶ 2, 3.  In the

---

[8]28 U.S.C. § 1503 provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court."

28 U.S.C § 2508 is a further jurisdictional grant that provides, "Upon the trial of any suit in the United States Court of Federal Claims in which any setoff, counterclaim, claim for damages, or other demand is set up on the part of the United States against any plaintiff making claim against the United States in said court, the court shall hear and determine such claim or demand both for and against the United States and plaintiff."

action in the district court, AEY relies, in part, on a legal theory advanced by Ralph Merrill, a former AEY associate who was also charged with and convicted of crimes related to fraud in performance of Delivery Order 2. *See id.* ¶ 3. Mr. Merrill advanced arguments in the Eleventh Circuit concerning the meaning of "acquisition" under the contract and challenging the sufficiency of the evidence regarding the materiality of the purported violations. *See id.* Overall, AEY is seeking to conform its counterclaim reply in this case to its claims pending in the district court. *Id.* at 4. The amended reply largely consists of denials of prior admissions regarding (1) whether AEY "acquired" ammunition from a prohibited source, Pl.'s Am. Countercl. Reply ¶¶ 27, 37, 64, 70; (2) whether AEY knew it was contractually prohibited from supplying the ammunition, *id.* ¶¶ 50-53, 58; and (3) the validity of the previously signed factual proffer, *id.* ¶¶ 78-83. AEY also seeks to amend its response to the government's counterclaim that AEY is liable for forfeiture of its claims under 28 U.S.C. § 2514. In its initial reply to the government's counterclaims, AEY alleged that "despite precedent to the contrary, 28 U.S.C. § 2514 properly applies only to the particular claims tainted by fraud." Pl.'s Reply to Countercl. ¶ 86. In its amended reply, AEY argues that "28 U.S.C. § 2514 conflicts with 41 U.S.C. § 7103(c)(2), a later enacted statute, which specifically contemplates the submission of several Claims under the same Contract, allowing payment of non-fraudulent money Claims notwithstanding fraud on other money Claims." Pl.'s Am. Countercl. Reply ¶ 86. The government opposes AEY's motion to amend its reply on the grounds of futility of the proposed amendments. Def.'s Resp. to Pl.'s Mot. for Leave to File Am. Countercl. Reply at 5.

Rule 15(a) of the Rules of the Court of Federal Claims ("RCFC") provides that a party seeking to amend its pleadings more than 21 days after service of the pleading or more than 21 days after a responsive pleading or certain motions are filed, may do so "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." RCFC 15(a)(2). RCFC 15(a) mirrors, in all pertinent respects, Fed. R. Civ. P. 15(a), and consequently application of Fed. R. Civ. P. 15(a) is highly persuasive in this court. *See Mitsui Foods, Inc. v. United States*, 867 F.2d 1401, 1403-04 (Fed. Cir. 1989) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). In *Foman*, the Supreme Court set forth a general standard to guide courts in applying Rule 15(a):

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman*, 371 U.S. at 182.

The government opposes AEY's motion to amend on grounds of futility. "When futility is asserted as a basis for denying a proposed amendment, courts do not engage in an extensive analysis of the merits of the proposed amendments. . . . Instead, courts simply decide whether a

party's proposed amendment is facially meritless and frivolous." *St. Paul Fire & Marine Ins. Co. v. United States*, 31 Fed. Cl. 151, 155 (1994) (holding that the government could amend its answer after two years had passed to include counterclaims even though it failed to secure a grand jury indictment on those counterclaims); *see also Centech Grp., Inc. v. United States*, 78 Fed. Cl. 658, 661 (2007) (approving clarification of complaint in a bid protest by addition of factual allegations elaborating on those initially made, rejecting a futility contention by the government).

First, the government argues that AEY is estopped from denying the admissions in its factual proffer and guilty plea that relate directly to admitting to perpetrating fraud against the government. *See* Def.'s Resp. to Pl.'s Mot. for Leave to File Am. Countercl. Reply at 6-7. According to the government, "[i]t is well established that '[a] criminal conviction is conclusive proof and operates as an estoppel on defendants as to the facts supporting the conviction in a subsequent civil [proceeding],'" *id.* at 7 (quoting *United States v. Uzzell*, 648 F. Supp. 1362, 1363-64 (D.D.C. 1986)), and AEY's conviction retains its res judicata effect at least until a decision is rendered on the pending challenge, *id.* The court accepts these principles of law put forward by the government, and it recognizes the potential res judicata effect of the guilty plea and the basis for that plea established in the accompanying factual proffer. The proceedings respecting that plea and factual proffer have not, however, been fully resolved, and the court must take that inchoate state into account in addressing AEY's motion to amend.

Second, the government challenges the amended reply as futile because the amendments are intended to allow AEY to maintain arguments asserted and rejected in *United States v. Merrill*, 685 F.3d 1002 (11th Cir. 2012). *See* Def.'s Resp. to Pl.'s Mot. for Leave to File Am. Countercl. Reply at 8. Mr. Merrill, an investor in AEY, challenged his criminal fraud conviction in connection with Delivery Order 2, in part, by asserting (1) that AEY never "acquired" ammunition from a communist Chinese military company within the terms of DFARS § 225.770-2 and (2) that the evidence was insufficient to show materiality of the purported violations. *See Merrill*, 685 F.3d at 1010-11. Mr. Merrill argued that because the Albanian MEICO acquired the ammunition from a communist Chinese military company long before AEY secured the ammunition from the Albanian MEICO to fulfill a contract with the United States, AEY did not "'acquire supplies or services covered by the United States Munitions List . . . through a contract or subcontract at any tier, from any [c]ommunist Chinese military company'" within the terms of DFARS § 225.770-2. *Id.* at 1011 (quoting DFARS § 225.770-2).

AEY's amended counterclaim reply seeks to make this same argument. *See* Pl's Am. Countercl. Reply ¶ 27. The Eleventh Circuit rejected all of Mr. Merrill's contentions on appeal, *Merrill*, 658 F.3d at 1005, and denied his petition for rehearing en banc, Order Denying Petition for Rehearing and Petition for Rehearing En Banc, *United States v. Merrill,* No. 11-11432 (11th Cir. Sep. 10, 2012). In its proffered amended reply, AEY argues that the Eleventh Circuit's denial of Mr. Merrill's petition only represents that the "[j]udges in active service on that [c]ourt found the panel decision not to conflict with the decisions of the Supreme Court of the United States of America or with other decisions of the United States Court of Appeals for the Eleventh Circuit." Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Leave to File Am. Countercl. Reply at 3-4 (citing Fed. R. App. P. 35(b)(1)(A)). AEY accurately restates Rule 35. And, decisions by the Eleventh Circuit, while persuasive, are not binding on this court. Despite the potential futility of

AEY's argument that it did not "acquire" ammunition from a communist Chinese military company, the court will allow AEY to file its amended counterclaim reply.

## II. Parties' Cross-Motions for Summary Judgment on Count I of the Government's Counterclaims

In Count I of the counterclaims, the government contends that AEY's claims for payment on the two invoices at issue are forfeited under the Forfeiture Statute. In their cross-motions for summary judgment, the parties dispute the applicability of that statute.

### A. Standard for Decision

RCFC 56(a) states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56 mirrors Fed. R. Civ. P. 56. *See* RCFC 56 Rules Committee Note, 2011 Amendment ("RCFC 56 has been rewritten in its entirety to reflect the corresponding revision of [Fed. R. Civ. P.] 56 that became effective December 1, 2010."). A fact is material if it "might affect the outcome of the suit under governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and an issue is genuine if it "may reasonably be resolved in favor of either party," *id.* at 250. The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. In this instance, both parties have moved for summary judgment and each bears a burden of showing the absence of any genuine issue of material fact. *See Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987) ("[T]he court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration); *see also Council for Tribal Emp't Rights v. United States*, 112 Fed. Cl. 231, 242 (2013) (applying *Mingus*). Because the salient facts are largely undisputed, issues of law are the focus of the court's inquiry.

### B. Analysis

Count I of the government's counterclaims is in essence an affirmative defense to AEY's claims. The government contends that AEY's claims are forfeited under the Forfeiture Statute, 28 U.S.C. § 2514, due to AEY's actions in supplying Chinese-made ammunition to satisfy Delivery Order 2 and endeavoring to conceal the country of manufacture. Def.'s Answer & Countercl. ¶¶ 85-86.

AEY contends that (1) the Forfeiture Statute properly applies only to the particular claims tainted by fraud; (2) the Army waived its rights under the Forfeiture Statute when it required and accepted the shipments at issue with knowledge of the fraud under Delivery Order 2; (3) the anti-fraud provisions of the CDA supersede the Forfeiture Statute;[9] and (4) the Forfeiture Statute

_____

[9]The CDA's anti-fraud provisions are codified at 41 U.S.C. § 7103(c). Paragraph 7103(c)(1) states, "No authority to settle. – This section does not authorize an *agency head* to

does not bar claims under separate delivery orders untainted by fraud.  *See* Pl.'s Mot. for Summ. Judgment at 1; Pl.'s Am. Countercl. Reply ¶ 86.

The government contends that the Forfeiture Statute provides for forfeiture of *all* of AEY's claims on this contract even though fraud has only been alleged regarding Delivery Order 2.  *See* Def.'s Cross-Mot. for Summ. Judgment at 6-8.  No fraud or impropriety has been alleged respecting Delivery Orders 3 and 4 generally or the invoices at issue here specifically, and the government accepted and used the ammunition AEY delivered under Delivery Orders 3 and 4. *See* Compl. ¶¶ 9, 15.

1. *The Forfeiture Statute.*

The scope of the Forfeiture Statute has been strongly contested recently in the Court of Federal Claims and the Federal Circuit.  The Forfeiture Statute states,

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States *in the proof, statement, establishment, or allowance thereof.*  In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514 (emphasis added).  Here, as in other recent cases, the parties dispute the meaning of the words "in the proof, statement, establishment, or allowance thereof."

The parties' initial motions for summary judgment focused largely on *Little v. United States*, 152 F. Supp. 84 (Ct. Cl. 1957), which is frequently cited in support of a broad interpretation of 28 U.S.C. § 2514.  In *Little*, the plaintiff had received a contract from the Veterans Administration to educate and train veterans.  *Little*, 152 F. Supp at 85.  The school was to operate under contract from January 1, 1949 to December 31, 1949.  *Id.*  In April 1949, the plaintiff received notice that his school was at risk of closure because it was not meeting the

---

settle, compromise, pay, or otherwise adjust any claim involving fraud." 41 U.S.C. § 7103(c)(1) (emphasis added).  This provision is part of the Section of the Contract Disputes Act that pertains to, and is headed as, "[d]ecision by contracting officer."  41 U.S.C. § 7103.  In effect, this provision removes fraud claims involving contracts from the purview of the agency dispute process.  *See* the discussion *infra*, at 16 n.13.  Paragraph 7103(c)(2) then provides for liability:

> Liability of contractor. – If a contractor is unable to support any part of the contractor's claim and it is determined that the inability is attributable to a misrepresentation of fact or fraud by the contractor, then the contractor is liable to the [f]ederal [g]overnment for an amount equal to the unsupported part of the claim plus all of the [f]ederal [g]overnment's costs attributable to reviewing the unsupported part of the claim.

41 U.S.C. § 7103(c)(2).

state's minimum requirements for the training of veterans.  *Id.* at 86.  After an initial spot check of the school's records, funding was suspended as of April 30, 1949.  *Id.*  After learning that a further investigation would be required, the school destroyed its attendance records for all veterans who were in training prior to January 3, 1949.  *Id.*  A more complete audit report by the Veterans Administration in July 1949 revealed a series of substantial irregularities in the school's attendance records.  *Id.*  Approval of the school was withdrawn entirely, and the contract was cancelled.  *Id.* at 87.  The plaintiff then sought, among other things, reimbursement for tuition, books, and supplies for the period from May 1 to August 4, 1949 when the school was in operation but no payments had been received for services rendered.  *Id.*  The government filed counterclaims asserting violations of the False Claims Act for claims for payment submitted to the government prior to May 1, 1949 and asserting forfeiture of the plaintiff's claims under the Forfeiture Statute.  *Id.*  The court explained:

> Plaintiff's present suit is for services rendered after April 30, 1949. . . .  The
> defendant does not allege that plaintiff practiced fraud after April 30, 1949,
> and the record does not establish fraud after that date.  It is true that [28 U.S.C.
> § 2514] was not intended to forfeit an otherwise valid claim of a claimant merely
> because, in some other unrelated transaction, he had defrauded the [g]overnment.
> But where, as in the present case, fraud was committed in regard to the very
> contract upon which the suit is brought, this court does not have the right to divide
> the contract and allow recovery on part of it.  Since plaintiff's claims are based
> entirely upon contract V3020V-241, a contract under which he practiced fraud
> against the [g]overnment, all of his claims under that contract will be forfeited
> pursuant to 28 U.S.C. § 2514.

*Id.* at 87-88.  *Little* has served as the basis for decisions in this court holding that fraud in the performance of a contract leads to forfeiture of all claims arising out of the contract.  *See, e.g.,* *American Heritage Bancorp v. United States*, 61 Fed. Cl. 376, 386 (2004) (The requirement of *Little* . . . has led . . . this court to apply the forfeiture statute to situations outside the strict terms of the statute.); *UMC Electronics Co. v. United States*, 43 Fed. Cl. 776, 791 (1999), *aff'd*, 249 F.3d 1337 (Fed. Cir. 2001) ("[Section] 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the government."); *Supermex, Inc. v. United States*, 35 Fed. Cl. 29, 40 (1996) ("[T]he fraudulent act [of bribery] . . . had an effect on every aspect of contract performance, making it virtually impossible to distinguish between tainted and untainted claims.").

After the parties filed their cross-motions for summary judgment on Count I, the Federal Circuit rendered its decision in *Kellogg Brown & Root Servs., Inc., v. United States*, 728 F.3d 1348 (Fed. Cir. 2013) ("*KBR II*"), which concluded that the Forfeiture Statute pertains to claims brought before the court, and does not also encompass contractual performance unrelated to those claims.  *KBR II*, 728 F.3d at 1366.  Because *KBR II* has relevance to the issue before the court in this case, the court requested that the parties submit supplemental briefs addressing that decision.  Order of Sep. 12, 2013, ECF No. 65.

In *KBR II*, the plaintiff, KBR, received a contract from the United States Army that among other things concerned the provision of dining facility services in the Middle East.  *KBR*

11

*II*, 728 F.3d at 1352.  The government determined that KBR had charged the government some unreasonable costs and refused to pay a portion of them.  *Id.*  KBR sued the government for the unpaid costs.  *Id.*  During discovery, the government learned that employees of KBR had been receiving kickbacks from a subcontractor in exchange for giving dining facility subcontracts to the subcontractor, and the government filed a forfeiture counterclaim.  *Kellogg Brown & Root Servs. v. United* States, 99 Fed. Cl. 488, 493 (2011) ("*KBR I*").  The government argued that the kickbacks "tainted" the entire contract with fraud, and that "any invoice submitted upon a fraud-tainted contract support[ed] the finding of a 'false or fraudulent' claim."  *KBR II*, 728 F.3d at 1365-66.  It urged that KBR should be liable for forfeiture of any and all claims under that contract.  *Id.*  The government's legal theory omitted any requirement of a nexus between the fraud and the claim submitted.  The trial court had distinguished *Little* and ruled in part in favor of KBR on issues involving the Forfeiture Statute.  *KBR I*, 99 Fed. Cl. at 498-501, 516.

On appeal, the Federal Circuit rejected the government's position, drawing in part on the trial court's analysis:

> A valid cause of action under [the Forfeiture Statute] must be tied to the submission of a claim, whether in producing false proof to support a claim, *see, e.g.*, [*Kamen Soap Prods. Co. v. United States*, 124 F. Supp. 608, 622 (Ct. Cl. 1954)] (forfeiting claim because falsified documentation was submitted in presentation of claim), or in falsely establishing the claim, *see, e.g.*, [*N.Y. Mkt. Gardeners' Ass'n v. United States*, 43 Ct. Cl. 114, 136 (1908)] (Government's objection to claim based on contractor's not fulfilling contract specification, i.e., "establishment" of a false claim).

*KBR II*, 728 F.3d at 1366 (alterations in original) (quoting *KBR I*, 99 Fed. Cl. at 501).  As the Circuit's decision noted:  "On its face, the statute is limited to those circumstances where the [g]overnment proves fraud 'in the proof, statement, establishment or allowance' of a *claim at the Court of Federal Claims, not in the execution of a contract*."  *Id.* (emphasis added).  Further, the Federal Circuit agreed with the trial court that the expansive interpretation of 28 U.S.C. § 2514 that had developed and persisted in this court was not in keeping with the plain meaning of the statute.  *See KBR II*, 728 F.3d at 1366 n.18 ("Several other Court of Federal Claims decisions state otherwise: 'The words of the statute make it apparent that a claim against the United States is to be forfeited if fraud is *practiced* during the contract performance *or* in the making of the claim.' *Crane Helicopter Servs., Inc. v. United States*, 45 Fed. Cl. 410, 431 (1991) (emphasis added); *see also Anderson v. United States,* 47 Fed. Cl. 438, 444 (2000); *Supermex, Inc. v. United States*, 35 Fed. Cl. 29, 39-40 (1996).  This is an impermissibly broad reading of the statute.").[10]  The Federal Circuit stressed that the statutory context confirms a more particular reading of the statute:

---

[10]In *KBR I*, the trial judge opined that while *Little* was not wrongly decided, it had been stretched far beyond its holding, pointing to *Brown Constr. Trades, Inc. v. United States*, 23 Cl. Ct. 214, 216 (1991), as the first major expansion of *Little*.  *See KBR I*, 99 Fed. Cl. at 499.  In *Brown Construction*, a contractor's vice-president was charged with bribery and conspiring to bribe a government official responsible for inspection of his work.  *Brown Constr.*, 23 Fed. Cl. at 215.  The contract was terminated, and the contractor filed suit for work completed prior to the

> The provision codified at section 2514 was part of legislation creating the Court of Federal Claims and regulating its operations and procedure. *See* Act of Mar. 3, 1863, ch. 92, 12 Stat. 765, 767. The surrounding provisions concern requirements for filing claims, including time limits and verification. Thus the neighboring provisions illustrate that the forfeiture statute is best understood as a companion requirement of claims procedure rather than a catch-all anti-fraud provision.

*Id.* at 1366.

In upholding the trial court's decision in *KBR I*, the Federal Circuit did not address that court's interpretation of the continuing validity of *Little*. The Federal Circuit only confirmed the invalidity of much of its progeny. The trial court had limited *Little* to its factual predicate, *i.e.*, that false proof had been submitted in a related claim under the contract. *See KBR I*, 99 Fed. Cl. at 498. Falsified attendance records, unrelated to the time period at issue in the claim, had been presented to the government for payment, and the government was seeking recovery of those overpayments made in reliance upon the fraudulent attendance records. Thus, according to the trial court, the rule from *Little* is that "fraud in the 'proof' of a claim, *i.e.*, the falsification of the underlying documents upon which the claim was based, voids each of the claims associated with the contract." *Id.* at 498. [11] As the trial court considered the matter, the rule derived from the Forefeiture Statute is not so broad as to conclude that every act of fraudulent performance is fraud in the "proof, statement, establishment, or allowance" of a claim. *Id.* at 498-99.

The facts in this case have some parallels to those in *Little*. As in *Little*, invoices based on false information were submitted to the government regarding Delivery Order 2, and later invoices, valid and conforming, were subsequently submitted regarding Delivery Orders 3 and 4 and were not paid by the government. The unequivocal statement in the Federal Circuit's

---

default termination. *Id.* at 214-15. The court held that the Forfeiture Statute applied to plaintiff's claim because the contract was "tainted by fraud." *Id.* at 216. "As a consequence, the court effectively read out of the law the requirement that the fraud relate to the 'proof, statement, establishment or allowance,' of [a] claim." *KBR I*, 99 Fed. Cl. at 500. This improper interpretation of *Little* had been carried forward to stand for the proposition that the Forfeiture Statute applies if there has been any fraud in the performance of a contract. *See, e.g., American Heritage Bancorp*, 61 Fed. Cl. at 387; *Anderson*, 47 Fed. Cl. at 444 ("[T]he statute is not confined to the presentment of the claim."); *UMC Electronics*, 43 Fed. Cl. at 790 ("[A] claim against the United States is to be forfeited if fraud is practiced during contract performance or in the making of a claim."); *Crane Helicopter Servs.*, 45 Fed. Cl. at 431 (same); *Supermex*, 35 Fed. Cl. at 39-40 (same); *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 435-36 (1994) ("28 U.S.C. § 2514 requires the forfeiture of all claims arising under a contract tainted by fraud against the government.").

[11]The term "claim" in the context used by the court in *KBR I* in explaining *Little* was apparently not limited to a legal claim presented to the court but instead referred to invoices (falsified vouchers) submitted to the government based on false attendance records maintained by Little prior to May 1, 1949. *See KBR I*, 99 Fed. Cl. at 498-99.

opinion in *KBR II* that the "statute is limited to those circumstances where the [g]overnment proves fraud 'in the proof, statement, establishment or allowance' of a claim at the Court of Federal Claims, not in the execution of a contract," 728 F.3d at 1366, is in tension with applicability of *Little* to this case.  Additionally, *KBR II* adheres to the plain meaning of the statutory text.  *See KBR II*, 728 F.3d at 1366 (citing *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)).  Nonetheless, this court need not now rule on the continuing validity of *Little* or its applicability to this case.[12]  The issue of waiver, discussed below, provides the immediate basis for ruling on the parties' cross-motions for summary judgment.

    2. *Waiver.*

    AEY contends that the government has waived its rights under the Forfeiture Statute because it "knew of AEY's fraud under [Delivery] Order 2 at the time it required and accepted delivery of the two shipments under [Delivery] Orders 3 and 4."  Pl.'s Mot. for Summ. Judgment at 10.  AEY has submitted numerous exhibits suggesting that the Army knew of the fraud at least by September 2007.  A timeline e-mailed by Melanie Johnson of the Army on March 29, 2008 states: "12 Sep[tember]: Telecon between Michael Mentavlos and Melanie Johnson and Kim Jones that D[efense ]C[riminal ]I[nvestigative ]S[ervice] has evidence that AEY obtained the 7.62 ammo from a prohibited source (China) . . . ." *Id.* Ex. 7, at 3.  Even before that teleconference, the government executed a search warrant on August 23, 2007 at AEY's place of business in Miami Beach, Florida.  Hr'g Tr. 27:1-6.  Nonetheless, six months later, as of February 2008, it appears that the Army wanted "the delivery of ammunition to continue," Pl.'s Am. Countercl. Reply Attach. 2, at 2 (e-mail from Col. Luigi Bieves to Daniel Stanwick (Feb. 22, 2008)), and was willing to accept the consequences.  In an e-mail, Lt. Col. Moises Gutierrez wrote,

> CJ4 has not had sufficient time to analyze the impact of immediate suspension of the 4 SAAM deliveries from AEY, Inc., nor staff the analysis to CSTC-A leadership.  Additionally the ANSF are moving into the Spring fighting season and most ammunition is critically needed.  The *ANP has zero 7.62 x 54 mm on-hand and is urgently waiting on deliveries of this ammo.*  As such, we are requesting that DCMA be engaged as soon as possible to ensure quality product/packaging, but that *deliveries continue given the criticality of need.*

*Id.* (e-mail from Lt. Col. Gutierrez to Col. Bieves (Feb. 22, 2008)) (emphasis added).

---

[12]This would be a very different case if the government were able to make credible allegations that AEY had obtained the underlying contract by fraudulent means.  *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542-44 (1943), *superseded by statute on other grounds as recognized in Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel Wilson*, 559 U.S. 280 (2010).  As the court stated in *United States v. United Technologies Corp.*, 626 F.3d 313, 319 (6th Cir. 2010), "*Hess* establishes that an invoice, which itself does not contain a falsity, may supply the premise for a false claim if submitted in connection with a fraudulently obtained contract." (citing *Hess*, 317 U.S. at 542-44) (discussing liability under the False Claims Act, which does not have the same intent requirement as the Forfeiture Statute).

In response to AEY's waiver argument, the government asserts that waiver does not apply because the Army did not know it was being defrauded on Delivery Order 2 when it issued Delivery Orders 3 and 4. *See* Def.'s Cross-Motion for Summ. Judgment at 19.  Moreover, the government avers that requiring the contracting officer to have refused delivery of the shipments at issue "would place [g]overnment contracting officials [in] an impossible position: reveal a criminal investigation by informing a contractor that they should halt deliveries of already placed [delivery] orders, or risk being forced to pay a contractor who may be engaged in fraud." *Id.*

As precedent for finding waiver of the Forfeiture Statute, AEY cites *Carrier Corp. v. United States*, 328 F.2d 328 (Ct. Cl. 1964).  *See* Pl.'s Mot. for Summ. Judgment at 10-13.  In *Carrier*, the plaintiff contracted with the government to produce high-explosive shells.  *Carrier Corp.*, 328 F.3d at 328.  A detailed quality-control system had been specified by the government, but eventually the government discovered that the plaintiff was bypassing a portion of the established quality control system to keep up with required production levels.  *See id.* at 329-332.  Upon discovery of the bypass, the government ordered production to stop.  *Id.* at 332.  Subsequently, the plaintiff and the government informally, via phone calls and letters, worked out provisions under which production could resume, and after fulfilling the requested provisions, plaintiff resumed production.  *Id.* at 332-33.  Ultimately, governmental officials rejected the provisions that allowed the resumption of production and canceled the contract.  *Id.* at 334.  The plaintiff then sued for breach, and the government sought forfeiture of the plaintiff's claim under 28 U.S.C. § 2514.  *Id.*  The court concluded that "[i]t would be manifestly unfair for defendant to practically agree to such an arrangement, induce [the plaintiff] to incur considerable new expense, and at the same time have lurking in the back of its mind the intention to cancel the whole contract, including the extra expense which the defendant had permitted and for practical purposes had authorized after full knowledge of the facts in connection with the basis for final cancellation." *Id.* at 334.  Accordingly, the court held that the government's discussions with the plaintiff amounted to a supplemental agreement untouched by fraud and that the government was not entitled to forfeiture of the plaintiff's claims.  *Id.* at 336.  The Court of Claims rejected the idea that the government could knowingly continue to benefit from a contract it knew it intended to cancel.  *See id.* at 336-37 ("[D]efendant's officials continued to discuss ways and means of canceling the entire contract, while the plaintiff incurred additional needless expense without its being advised of the nature of the discussion. While the decision was reached on December 16, plaintiff was not notified until December 29.").

The government resists applicability of *Carrier* by asserting that there was no "supplemental agreement" in this case, Def.'s Cross-Mot. For Summ. Judgment at 17, but the factual patterns in that case and this one have many similarities.  Here the government became aware of a fraud, but it chose to continue benefitting from the contract before ultimately canceling the contract and claiming forfeiture of the contractor's claims.  The government's contention that it was under a "gag order" and could not halt shipments without jeopardizing its investigation, *id.* at 20, ignores the record evidence that the ordered shipments of ammunition were continued because they were desperately needed.

In the alternative, the government argues there are outstanding issues of material fact that would make a decision on waiver premature, *see* Def.'s Cross-Mot. for Summ. Judgment at 29-30.  The court agrees.  The specific timing of the issuance, delivery, and acceptance of Delivery

Orders 3 and 4 are generally delineated by the existing record, as are some of the government's activities to investigate AEY's activities to deliver Chinese-made ammunition for Delivery Order 2. But, details may illuminate the timeline and the government's actions in accepting the delivery and then immediately suspending AEY from future contracting with the government.

     3. *Synopsis*.

     Due to the viability of AEY's argument that the government waived its protections under the Forfeiture Statute in this case and the genuine issues of material fact regarding that issue, neither party's motion for summary judgment can be granted. In the circumstances, the court need not now address AEY's arguments that 28 U.S.C. § 2514 is superseded by the CDA's anti-fraud provisions[13] and that each delivery order constitutes a separate contract.[14]

### III. AEY's Motion to Dismiss Count II of the Government's Counterclaims, Which Sets Out Allegations Premised on the False Claims Act

     Count II of the government's counterclaims alleges that AEY is liable under the False Claims Act ("FCA") for the prior invoices submitted for the ammunition shipped under Delivery Order 2 that was manufactured by a communist Chinese military company. *See* Def.'s Answer & Countercl. ¶¶ 87-92. *See* Def.'s Ans. & Countercl. ¶¶ 87-92. AEY has moved to dismiss this count of the government's counterclaims, arguing that it was a compulsory counterclaim that

---

     [13]AEY asserts that the CDA provisions specifically contemplate "the submission of several [c]laims under the same [c]ontract, allowing payment of non-fraudulent money [c]laims not-withstanding fraud on other money [c]laims." Pl.'s Am. Countercl. Reply at 21. In a hyper-technical legal sense, this position can be understood as a restatement of the principle that the Contract Disputes Act does not allow a contracting officer to consider claims involving fraud. *See Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540, 545 (Fed. Cir. 1988) ("Congress did not intend fraud claims by the government to be included in the dispute process outlined by section 605(a) [of the Act, now recodified as 41 U.S.C. § 7103(a)].")"; *see also* 48 C.F.R. § 33.210("The authority [of a contracting officer] to decide or resolve claims does not extend to . . . (b) [t]he settlement, compromise, judgment or adjustment of any claim involving fraud."). The contracting officer's action in this case to rule on fraud in denying AEY's claims regarding Delivery Orders 3 and 4 does not, however, affect in any realistic way this court's judicial power to adjudicate AEY's and the government's competing claims because the court can ignore the contracting officer's specific conclusions and treat the officer's action as a straightforward denial of AEY's claims. In all events, the court considers an action on a claim as a *de novo* matter, and not as an appeal from a contracting officer's decision. *See* 41 U.S.C. § 7104(b)(4) ("An action under paragraph (1) or (2)[, *i.e.*, inclusive of an action brought in this court on a claim that has been presented to a contracting officer] shall proceed de novo in accordance with the rules of the appropriate court.").

     [14]AEY submits that if each delivery order is considered a distinct contract, then fraud under Delivery Order 2 cannot "taint" Delivery Orders 3 and 4 in any case. Pl.'s Mot. for Summ. Judgment at 9.

should have been brought in *AEY I*, the prior civil case in this court, and is barred by claim preclusion.  Pl.'s RCFC 12(b)(6) Mot. to Dismiss Def.'s Cross-Mot. ¶¶ 2-3, ECF No. 38.[15]

      The government alleges violations of two provisions of the FCA, calibrating its allegations to fit the effective dates of amendments to the Act.  *See* Def.'s Answer & Countercl. ¶¶ 89-92.  The Act was amended by Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted on May 20, 2009.  Generally, the amended provisions only "apply to conduct on or after the date of enactment," but with one exception that is arguably applicable to this case. Pub. L. 111-21, § 4(f), 123 Stat. 1625 (codified at 31 USC § 3729 note (2012) (effective date of 2009 amendment)). [16]  The count of the government's counterclaims rests on one un-amended provision and one amended provision.  The unamended provision, 31 U.S.C. § 3729(a)(1) provides that, for any person who

> knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval . . . the court may assess not less than 2 times the amount of damages which the [g]overnment sustains because of the act of the person.  A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

31 U.S.C. § 3729(a)(1) (2006).  Notably, the government's count sets out minimal allegations of damage sustained as a result of AEY's delivery of Albanian-derived, Chinese-manufactured ammunition to satisfy Delivery Order 2.  *See* Def.'s Answer & Countercl. ¶ 89 ("Because of the false [Certificates of Conformance], the United States Government paid AEY a total of $10,331,736.44 to which AEY was not entitled.").  The government apparently accepted and used that ammunition.

---

[15]The government did not move for summary judgment regarding this count, and so the merits of this count are not currently before the court for decision.

[16]In pertinent part, Subsection 4(f) of FERA reads:

> Effective Date and Application. – The amendments made by this section shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment, except that – (1) subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. [§] 3729 et seq.) that are pending on or after that date.

31 U.S.C. § 3729 note (2012).

The amended provision, 31 U.S.C. § 3729(a)(1)(B), took effect as if enacted on June 7, 2008 and applies to all claims under the False Claims Act that were pending on or after that date.  The pertinent portion of Section 3729 states that any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . [,] is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2641 note; Public Law 10[1]-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(B).[17]

In *AEY I*, AEY challenged the Army's termination of its contract for default, seeking a declaration that AEY was not in default and conversion to a termination for convenience.  Pl.'s Resp. to Def.'s Cross-Mot. at 3, ECF No. 37-1.  In that action, that government filed a motion to dismiss, which the court treated as a motion for summary judgment because "matters outside the pleadings [were] presented to and not excluded by the court." *AEY I*, 99 Fed. Cl. at 303 (quoting RCFC 12(d)).

RCFC 13, the rule governing compulsory counterclaims, requires that "[a] pleading state as a counterclaim any claim that – at the time of its service – the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction."  RCFC 13(a)(1).  The government does not dispute that its FCA counterclaim arises out of the same "transaction or occurrence" addressed in the prior civil case, but it contends that it never filed a "pleading" within the terms of the rules, and so it was never required to bring the counterclaim.  Def.'s Resp. to Pl.'s Mot. to Dismiss at 5-6, ECF No. 41.  The government is correct.  RCFC Rule 7(a) lists the pleadings allowed in this court, and neither a motion to dismiss nor a motion for summary judgment is considered a pleading.  As a consequence, courts have consistently held that a motion for summary judgment is not a "pleading" and does not trigger a requirement to file compulsory counterclaims.  *See, e.g.*, *Horn & Hardart Co. v. National Rail Passenger Corp.*, 843 F.2d 546, 549 (D.C. Cir. 1988) (ruling in a claim for further relief under the Declaratory Judgment Act, that a motion for summary judgment filed in the prior proceeding did not trigger the compulsory counterclaim requirement of Fed. R. Civ. P. 13(a)); *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431, 436 (5th Cir. 1987) (holding that motion for summary judgment is not a responsive pleading).

---

[17]In essence, Section 3729 imposes a penalty on a person who knowingly presents a false claim wholly apart from proof of any specific damages.  *See Daewoo Eng'g & Constr. Co. v. United States*, 557 F.3d 1332, 1340 (Fed. Cir. 2009) ("Because the court did not find that the government incurred damages from Daewoo's false claim, the court properly assessed only the statutory penalty.").

Similarly, the government is not otherwise prohibited from bringing its counterclaim by the common law rules of claim preclusion. Claim preclusion refers to the "effect of foreclosing any litigation of matters that never have been litigated, because of a determination that they should have been advanced in an earlier suit." 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4402 (2d. ed. 2002); *see also Nevada v. United States*, 463 U.S. 110, 129-30 (1983) (considering that a final judgment is "a finality as to the claim or demand in controversy . . . not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose" (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 352 (1876))). In this respect, the Federal Circuit has recognized rules particular to "defendant preclusion." *See Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1324 (Fed. Cir. 2008). The court in *Nasalok* applied the *Restatement (Second) of Judgments* § 22(2) (1982), which states: "A defendant who may interpose a claim as a counterclaim but fails to do so is precluded after the rendition of judgment in that action, from maintaining an action on the claim, if: (a) [t]he counterclaim is required to be interposed by a compulsory counterclaim statute or rule of court [*e.g.*, RCFC 13(a)] or (b) [t]he relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action." *Restatement (Second) of Judgments*, § 22(2); *see Nasalok*, 522 F.3d at 1324.

In this case, the government was not required by RCFC 13(a) to bring its counterclaim in the prior action, and there is no concern that if the government prevails on its FCA counterclaim that it would have an adverse effect on the court's prior judgment. Consequently, the government's FCA counterclaim is not barred by application of RCFC 13(a) or claim preclusion.

## CONCLUSION

For the reasons stated, AEY's motion for summary judgment as to Count I of the government's counterclaims and its motion to dismiss Count II of the government's counterclaims are DENIED. The government's motion for summary judgment as to Count I of its counterclaims is also DENIED. AEY's motion to file an amended reply to the government's counterclaims is GRANTED.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge